THOMPSON *v.* THE ANDROSCOGGIN RIVER IMPROVEMENT CO.

Androscoggin river, in the town of Berlin, is a natural highway for floating logs.

The rule laid down in *Eaton* v. *B. C. & M. R. R.*, 51 N. H. 504, as to what consequential damage is a taking of property in the exercise of the power of eminent domain, affirmed.

CASE, for flowing the plaintiff's land, on the Androscoggin river, in the town of Berlin, below the defendants' dams. The defendants pleaded the general issue, and filed the following brief statement of defence : That the general court of the state of New Hampshire, at

their session in June, 1852, passed an act of which the following is a copy :

An Act to incorporate the Androscoggin River Improvement Company.

SECTION 1. *Be it enacted by the Senate and House of Representatives in General Court convened,* That Jacob Hazen, Leonard E. Dunn, and E. S. Coe, their associates, successors, and assigns, are constituted and made a body politic and corporate by the name of the Androscoggin River Improvement Company, and shall continue for the term of thirty years, with power to sue and be sued, prosecute and defend to final judgment, to have a common seal, make such by-laws for the due regulation of said company as may be necessary, provided they be not repugnant to the laws of the state, and to have all the powers and privileges, and be subject to all the liabilities of corporations of a similar nature, and may purchase and hold real estate and other property, not exceeding five thousand dollars, to be held in shares of fifty dollars each.

SEC. 2. *Be it further enacted,* That said corporation may clear, deepen, and improve the channel of the Androscoggin river, where they may deem it necessary, from the source of said river to the northern limits of the Androscoggin Boom Company, with the right to make dams, sluices, side booms, and other improvements in said river, whereby the facilities for the running of logs, masts, spars, and rafts of lumber will be improved : *Provided,* however, that said improvements shall not injuriously affect the land and privileges within their location; and should the owner or owners of any property situated within said location feel that his or their property was damaged by said improvements, he or they may apply to the court of common pleas in said county, and said court shall, on application of the party aggrieved, cause said damage to be estimated by a committee of three disinterested freeholders in said county : *Provided,* however, that if either party be dissatisfied with the award of said committee, and shall at the term of the court where said award is presented apply to said court for a trial by jury, in the same manner other like cases are determined, the said court shall by jury determine the amount of such damage accordingly.

SEC. 3. *Be it further enacted,* If any person shall wantonly or maliciously injure any of said erections or side booms which may be constructed by said corporation, he shall, on conviction thereof, be punished by a fine not exceeding five hundred dollars, and shall be liable to pay triple damages to said corporation, to be recovered in an action before any court of competent jurisdiction.

SEC. 4. *Be it further enacted,* That said corporation shall be allowed a toll on all logs, masts, spars, and other lumber which may pass any of said improvements, as follows : six cents for each and every log, mast, or spar which may be put into the water above the Errol falls, so called, and three cents for each and every log, mast, or spar which may be put into the river below said falls, and ten cents per thousand

feet, board measure, for all rafts of boards, sawed or hewed timber, shingles, clapboards, and other lumber which may pass said improvements, and said corporation shall have a lien on all logs, masts, spars, and other lumber which pass said improvements, and may hold possession of the same until said toll is paid or satisfactorily secured: *Provided,* That all short logs put into the river below Errol falls shall be free of toll, the other lumber subject to the tolls as specified.

SEC. 5. *Be it further enacted,* That all the owners of land from which the logs and other lumber which pass through and over said improvements are cut shall have the right to take an interest in the stock of this company, *pro rata* their interest in said land, provided they elect so to do before the making of said improvements.

SEC. 6. *Be it further enacted,* That either of the persons named in this act may call the first meeting of the corporation by giving personal notice, or posting up a notice thereof at the public house in Errol, giving notice of the time, place, and object of said meeting, seven days prior to said meeting.

SEC. 7. *Be it further enacted,* That the legislature may alter, amend, or repeal this act whenever in their judgment the public good may require.

SEC. 8. This act shall take effect from and after its passage.

Approved June 18, 1852.

That under said act of incorporation the defendants were duly organized as a corporation, and became entitled to all the benefits of said act, and thereafterwards, in the years 1852 and 1853, the defendants did, under and by virtue of said act, and in accordance therewith, clear, deepen, and improve the channel of the Androscoggin river in various places where they deemed it necessary, from the source of said river to the northern limits of the Androscoggin Boom Company, and did make dams, sluices, and side booms, and other improvements in said river, whereby the facilities for running logs, masts, spars, and rafts of lumber should be improved. That said land of the plaintiff is situated below the northern limits of the Androscoggin Boom Company, and not within the defendants' location; and, in the fair and reasonable use of their dams, sluices, and improvements, the defendants did, for the purpose of running logs, masts, and spars, and for no other purpose, let out water, at various times during the time mentioned in the declaration, which water was held and retained by their said dams, and did use the same to float logs, masts, and spars down said river, as by their said act of incorporation they had a right to do; and in so doing they used and managed said water in a prudent manner for the purpose aforesaid, and in the use thereof were careful to do as little damage as possible; that whatever damage was done to the plaintiff's land, as set forth in his writ, was done as aforesaid in the due exercise of the defendants' rights under said act, and in no other way, and in the use of said river as a public highway, and in driving logs, masts, and spars as aforesaid.

By agreement, the question whether the facts set forth in the brief statement constitute a defence was reserved.

Doe, J.   The defendants claim that Androscoggin river is a highway; that the public right of a highway (whether created by prescription, nature, eminent domain, or grant), on land or water, includes the right of reasonably improving the way from time time, as well as the right of reasonably using it in the natural condition of the land or water where the way is; that the defendants' charter authorizes them, as public agents, to improve the Androscoggin as a highway for floating logs, by letting water out of their dams above the plaintiff's land, and reasonably increasing the natural volume of the stream flowing over his land at certain seasons, and to reasonably use the highway thus reasonably improved; and that the plaintiff is not entitled to compensation, because his riparian rights are subject to the public right of reasonably, carefully, and skilfully improving, as well as reasonably, carefully, and skilfully using, the Androscoggin highway.   Upon the claim of a public right to make a reasonable improvement of a highway, we do not, in the present posture of the case, express any opinion, and whatever is said is to be taken as if there were no question of such an improvement in the case.

I.  We see no reason to doubt that the Androscoggin is a natural highway, through the town of Berlin (where the plaintiff's land lies), for floating logs, at the times and in the manner in which it is naturally capable of floating them.   That it is, in the present condition of the country, at some times and to some extent, naturally capable of floating logs, and reasonably being substantially useful to the public for that kind of navigation, is a fact of history and physical geography, of which it is our duty to take judicial notice,—1 Gr. Ev., secs. 5, 6, *Talbot* v. *Hudson*, 16 Gray 417, 424; and if any other fact could have any tendency to show that this natural capacity of the stream for reasonably being a highway of material public utility, does not have the usual legal effect of making it a highway, it has not been suggested that any such other fact exists.   Though not "navigable" in the English technical sense (that is, not tide-water), it is a highway by the law of nature, adopted by the English common law, which in this respect, being suited to the condition of this state, is a part of our common law.   An intention to discontinue such a highway cannot be inferred from a public grant of the land under and around it,—a mere alienation of the ownership of the soil by an ordinary form of conveyance.   A sale by the state of all its ungranted land could not be construed as a relinquishment and abolition of the public rights of navigation in Piscataqua river or Lake Winnipiseogee.   To such water-ways many statutes relating to highways on land are not applicable.

In *Scott* v. *Willson*, 3 N. H. 321, 325, it was said that rivers above the ebb and flow of the sea may, by usage, become public highways, and that the Connecticut, in this state, had been so long used by the public for the purpose of boating and rafting, that it must be considered

as a public highway. If this means that such rivers can become highways only by adverse use, or that the Connecticut was not a highway until a public right of way was acquired by prescription, the meaning, to that extent, is contrary to authority and reason. A prescriptive public right of way, judicially recognized, and not found by a jury, might, in *Scott* v. *Willson*, practically answer the purpose of a natural right; but to hold that the public right of way in that case was prescriptive and not natural, would, as a matter of law, be erroneous. The first man who used the Connecticut as a highway, under Indian or English law, had a legal right so to use it, as the public now has. If the entire channel through the Haverhill meadows should be naturally and permanently changed to-morrow, the new route would instantaneously be a natural highway which the riparian owners could not unreasonably obstruct, and a reasonable public use of which would not trench upon riparian rights.

If the defendants' pleading is defective in not alleging that the Androscoggin is a highway, the defect may be remedied by amendment.

II. Counsel agree that there is no provision in the defendants' charter, or in any other statute, for compensating the plaintiff for his alleged damage. His common-law remedy not being taken from him in exchange for a statutory one, he may maintain this suit if he has a cause of action.

The defendants claim that they were authorized by their charter to do what they did; that their charter is a law; that what the law permits is lawful; that what the law authorizes them to do, with an implied obligation of ordinary and reasonable care and skill, they are not liable for carefully and skilfully doing; that the plaintiff's property was not taken; that his damage was remote and consequential; and that the only question is, whether, in fact, they exercised ordinary and reasonable care and skill in making and using an authorized reasonable improvement of the Androscoggin highway.

In *Eaton* v. *B. C. & M. R. R.*, 51 N. H. 504, the plaintiff's farm was damaged by a river let in upon it, through a cut made by the defendants for their railway through the river bank on land of a third person. It is stated in the opinion (pp. 506, 507, 515, 520, 528) that it was virtually conceded that if the cut had been made by the riparian owner (whom we will call R), without any right acquired from the plaintiff or from the legislature, he would have been liable for the damage complained of by the plaintiff, and that the defendants were confessedly liable unless their case could be distinguished from that of R; and, upon the ground that making so deep a cut at that place would in fact be an unreasonable use for R to make of his own land, likely to cause such damage as happened, and such as he ought to foresee and avoid, either by not making the cut, or by guarding against the natural and apparent consequences of making it (a fact that would probably have been found by a jury if it had not been conceded), that the cut was made without the plaintiff's consent, and that the compensation received by the plaintiff was for the damage done and to be done by

building, maintaining, and using the railroad on his own land only, and not for damage done or to be done to his land by an unreasonable use of R's land, it was held that the defendants were liable; that the legislature could not authorize R or the defendants to inflict such an injury upon the plaintiff without compensation; that, whether the cut were made by the defendants acting under legislative authority, or by R without such authority, the damage done by making the cut, and thereby causing the river to pour itself upon the plaintiff's land, would not be remote or consequential in the sense of being a remediless calamity; and, so far as it is necessary in this case to revise that decision,— so far as that decision was adverse to a defence founded on the remote and consequential character of the damage, and the lawfulness of such damage, when done in the careful and skilful pursuance of legislative authority, in such case as that,—we have not been able to discover any error.

Cutting the roadway through the bank was removing a natural dam, or digging an artificial canal. It was taken as admitted that making the cut where it was, and as deep as it was, would have been, as against the plaintiff, an unreasonable use for R to make of the bank, with whatever care and skill the cut were made; that the plaintiff's damage was reasonably to be expected as a natural consequence; and that such a damage, caused by R making such a use of his own, would have been a violation of the plaintiff's rights of property.

A damage caused by a breach of a contract is often called consequential (in the technical sense of being a consequence so remote or unexpected as not to entitle the sufferer to redress) when it cannot be reasonably supposed to have been contemplated by the parties, in making the contract, as likely to be caused by a breach ; and in tort, a damage is often called consequential when it was not a reasonably necessary consequence, or one so natural and probable that the defendant can be reasonably supposed to have foreseen the likelihood of its being caused by the wrong complained of. Eaton's damage was not consequential in that sense, for it was reasonably to be expected as a natural consequence of making the cut where it was and as deep as it was, however carefully and skilfully the work might be done, and was equally to be expected whether the cut were made by R or by the defendants. *Eaton* v. *Railroad*, pp. 519, 520.

If R had concealed a spring-gun or torpedo on his own land for the protection of his own property against trespassers or burglars, and, years afterwards, Eaton's property on his own land, without any fault on his part, had been injured by a missile thrown by R's defensive machinery,—and the damage had been a natural and reasonably necessary consequence of an explosion caused by the machinery being accidentally put in motion by a trespasser or burglar, and a consequence which R must have anticipated as likely to happen,—the remote and consequential character of the damage would not have prevented Eaton from maintaining an action against R. Whether R, by an unreasonable use of his own land, made it probable that Eaton's property would

be injured by a shot from a spring-gun, or by sand, gravel, and stones carried by a river, the damage would not be remediless on account of its remote or consequential character; and it would be no more remote or consequential when caused by a railroad corporation than when caused by R. What difference, in legal remoteness or consequentialness, whether the river were poured on Eaton's land through an excavated roadway, a canal, or a pump?—*Eaton* v. *Railroad*, p. 514—whether water were poured on his land or body, or whether his land or body were thrown into water?—whether the damage were caused by a natural or an artificial person?

If Eaton's damage had been one not reasonably to be expected; if it had been one that a man of ordinary foresight and prudence would have had no apprehension of; if the river could not have been reasonably expected to rise high enough to flow through the cut, or, for any reason, could not have been reasonably expected to flow from the cut upon Eaton's farm,—the cut might have been at first, as against Eaton, a reasonable use, whether its continuance, after notice of Eaton's damage, would be reasonable or not;—not that a reasonable expectation of Eaton's damage would in all cases be the sole test of the unreasonableness of R's use of his own land as against Eaton, for there are many uses of land that are reasonable, although the land-owner knows they will cause a damage to his neighbor. *Bassett* v. *S. M. Co.*, 43 N. H. 569, 577; *Hayes* v. *Waldron*, 44 N. H. 580; *Swett* v. *Cutts*, 50 N. H. 439; *Eaton* v. *Railroad*, pp. 527, 528. It may be reasonable for a man, under various circumstances, on his own land, to raise a certain amount of dust, notwithstanding it evidently will be blown upon and cause damage to the adjacent premises: and so of sights, sounds, and odors. Light, air, water, and many natural and artificial agencies, may render a reasonable use of one's own detrimental to others; and many considerations, besides reasonable expectation of damage, may enter into the broad question of reasonable use. It was not necessary, in *Eaton* v. *Railroad*, to compose a catalogue of all the possible elements of reasonableness and unreasonableness. It was taken as admitted that R would have been liable for doing what the defendants did on his land, not for want of care or skill in the method of doing it, nor for want of any advantage to be derived from it, but for causing the river (by the location and depth of the cut) to be poured on Eaton's farm, and doing him a damage reasonably to be expected, in violation of his right of being uninjured by such a use of R's land as (all the elements of reasonableness in that case being considered) was unreasonable. *Com.* v. *Tewksbury*, 11 Met. 55.

Property in land must be considered, for many purposes, not as an absolute, unrestricted dominion, but as an aggregation of qualified privileges, the limits of which are prescribed by the equality of rights, and the correlation of rights and obligations necessary for the highest enjoyment of land by the entire community of proprietors. Two of Eaton's proprietary rights in the tract of land described as his farm—his right of exclusive possession and his right of reasonable use of the

soil—included the right that the soil should not be injured by R either appropriating it to his own use, or committing a trespass upon it, or making an unreasonable use of his own land. When Eaton's right of not being injured by an unreasonable use of R's land was invaded, his property was taken, in the same legal sense in which it would have been taken if his right of not being injured by a trespass or appropriation had been infringed. If Eaton's farm had been damaged by R's reasonable use of his own land, Eaton would have had no cause of action ; his rights would not have been invaded by R exercising his right of reasonably using his own. The proprietary rights of each were limited in that manner. They were not absolute in respect to each one's use of his own : they included a right in respect to the use of the other's. The soil is often called property ; and this use of language is sufficiently accurate for some purposes. But the proposition that the soil is property conveys a very imperfect idea of the numerous and variously limited rights comprised in landed estate ; and it is sometimes necessary to remember that the name of property belongs to some of the essential proprietary rights vested in the person called the owner of the soil. A refusal to pay a debt is an injury to the property of the creditor. 25 N. H. 540. A patent right, a copyright, a right of action, an easement, an incorporeal hereditament, may be property as valuable as a granite quarry ; and the owner of such property may be practically deprived of it,—such property may be practically taken from its owner,— although it is not corporeal. So those proprietary rights, which are the only valuable attributes or ingredients of a land-owner's property, may be taken from him, without an asportation or adverse personal occupation of that portion of the earth which is his in the limited sense of being the subject of certain legally recognized proprietary rights which he may exercise for a short time. Property is taken when any one of those proprietary rights is taken, of which property consists. *Arimond* v. *Green Bay, &c., Co.*, 31 Wis. 316, 335. Eaton's right of not being injured in his real estate by an unreasonable use of R's land, was one of the proprietary rights of which his general and comprehensive right of property was composed. And that particular right of being uninjured by an unreasonable use of R's land was equally an element of his property, whether such a use were made of R's land by R or by the defendants.

The right of R to make a reasonable use of his own (although such a use might cause a damage to Eaton's farm), like other rights included in R's property, could be transferred to the defendants (the B. C. & M. R. R.) by R himself, or by the legislature exercising the public power of compulsory purchase, commonly called eminent domain. But the right, by an unreasonable use of R's land to cause a damage to Eaton's farm, not being R's right, could not be transferred from R to the defendants by R, or by eminent domain, or by any other person or power. Eaton's right of not suffering the damage done his farm by the unreasonable use of R's land could be legally taken from him : he could voluntarily divest himself of it : he could be compul-

sorily deprived of it by the legislature wielding that power of eminent domain which requires compensation.

Much that is said in the books concerning the remoteness and consequentialness of damage caused by a person acting under legislative authority is a dark and circumlocutory statement of the question, whether the use of land by which the damage was caused would have been a reasonable use for the owner of the land to make of it, unauthorized by the legislature, and disturbing no public right,—whether it would have been an exercise of his right of property, which right has been taken from him by the public power of eminent domain, and, being thus taken by the public and appropriated to its own use, may be rightfully exercised by a duly authorized public agent. *Eaton* v. *Railroad*, pp. 527, 528.

Mr. Sedgwick states the true doctrine, in the confused and misleading form in which it is found in many decisions, when, treating of " consequential damages," he says,—"An important question   &ast;   &ast; has frequently presented itself as to the liability of grantees of a public franchise, or the public agents of government, for consequential damages resulting from the exercise of the powers granted to them, as, for instance, in the case of canal and railroad corporations, or commissioners of public works. The question sometimes arises in actions of trespass, sometimes in actions on the case; but the rule is substantially the same, whatever the form of action. And the general rule is, that where the grantees or agents have not exceeded the power conferred on them, and when they are not chargeable with want of due care, no claim can be maintained for any damage resulting from their acts; *actus legis nemini est damnosus.* Otherwise the absurdity would follow, that operations undertaken and conducted by virtue of the supreme authority are unauthorized in the view of the law, and lay a foundation for damages. The proper light in which to regard the matter is to consider the grantee of the franchise, or the public agent, so long as he does not transcend the authority conferred on him as representing the government, and the government as acting under its right of eminent domain, subject, of course, to its liability to make compensation, and to that liability only. And the protection is extended, not merely to the immediate grantees of the franchise, or the immediate agents of the government, but to the sub-agents or inferior employés who are acting under the same general authority. The loss sustained in all such cases is *damnum absque injuria.*" Sedgwick on Damages (2d ed.) 110–112; Sedgwick on St. and Const. Law (2d ed.) 456–463.

" The power conferred " (under eminent domain) is, to do something with ordinary care, because the right to do that thing with ordinary care was somebody's right of property which has been taken from him by a compulsory purchase, and appropriated to a public use; the right, after it was bought, remained in its legal sense what it was before. The public agents (whether called public agents or grantees of a public franchise) are not liable for any damage resulting from

their acts, if they do not exceed the power or transcend the authority conferred on them; otherwise the absurdity would follow, that power is not power, and authority is not authority. In *Eaton* v. *Railroad*, the public (by their agents, the defendants) took from R, and converted to its own use, R's right to make a reasonable use of his own land,— that is, a right to make such a use of his land as it would be reasonable for him to make without compensating Eaton or any one else for any damage resulting therefrom. In making such a use of R's land, the defendants would not transcend the authority conferred upon them. But in making an unreasonable use of R's land as against Eaton, and thereby causing Eaton's land to be injured, they took Eaton's property without compensation, and transcended their authority. The power of eminent domain could neither take from R a right (to make such a use of his land) which he never possessed, nor take from Eaton, without compensation, his proprietary right to be unharmed by such a use of R's land. Thus interpreted and applied, the rule fairly stated by Sedgwick as the result of the adjudicated cases is intelligible and sound. It is generally called a rule of consequential damages. And it may safely be called so, if sufficient pains b taken to give such an explanation of its operation and effect as w' show how unmeaning and inappropriate the name is.

If the railroad company, by changing th' ,ourse of traffic and travel and causing a village to be built on R's land, had reduced the value of Eaton's property in a neighboring village more than the entire worth of his farm, they would not have been liable to him for that damage. They would have been justified, not on the ground that the damage was remote and consequential, in the sense of being a remote consequence, but on the ground that a railroad, changing the channels of commerce and causing a rival village to spring up, would be a reasonable use for others to make of their land, an exercise of their rights of property in land, and not a violation of Eaton's rights. The idea sometimes conveyed, in such a case, by the supposed doctrine of remote and consequential damage is, that, although the sufferer's legal right is violated, the damage is too remotely consequential, too remote in degree, to be actionable; as if the law would not give redress for the violation of a legal right, when the space between cause and effect exceeds a certain prescribed legal distance. A proprietor's right may be more seriously infringed by a cut through the bank of a river at a great distance from his land, than by a railway built across his hearthstone.

One of Eaton's proprietary rights was the correlative of R's duty of abstaining from such a use of air and water, and from such an interference with their quality and circulation, as would be unreasonable and injurious to the enjoyment of Eaton's farm. The same principle governs the ownership and use of land, and all material things. Whether we say that R had a right to make a reasonable use of his land, and thereby cause a damage to Eaton, or that he had not a right, by an unreasonable use of his land, to injure Eaton, or that Eaton had

a right not to be injured by R's unreasonable use of his own land, we mean the same thing. The principle may be expressed in an affirmative or a negative form, in a statement of rights or a statement of duties. Calling it a rule of consequential damages, or treating it under that head, tends to envelop a very plain matter in unnecessary obscurity.

If the narrow strip where the cut was made were deeply covered with brush, which could not be burned there without burning Eaton's house on Eaton's land except by incurring an expense greater than the value of the strip, it would be an unreasonable use for R to make of that strip to burn the brush on it without incurring that expense. If, in building a private turnpike, canal, or railway for himself, it were necessary for him to remove the brush, he could not lawfully remove it by such a conflagration as would manifestly destroy Eaton's house; and if the defendants (the railroad company), under the power of eminent domain, acquired all of R's rights, whence would they derive a right to burn the brush there and thereby burn Eaton's house, in a manner in which R could not rightfully burn it? And what difference would there be in the legal rights of the parties, whether they were considered in reference to the use of land, the use of brush, or the use of fire?

R might have been, in a certain sense, the absolute owner of the strip where the cut was made. He might have dug a pit in it, or thrown it up into a mound; but his so-called absolute legal control of his own soil was far from being unlimited. His pit might be so deep, or his mound so high, as to endanger the adjoining estates of his neighbors, however carefully and skilfully he conducted his operations; and such a use of his land as it would manifestly be beyond the power of human care and skill to make with safety to his neighbors might be an unreasonable use, for the natural and apparent consequences of which he would be liable. What legal difference whether his excavation engulfs Eaton's adjoining field, or inundates it? whether Eaton's field is damaged by the carelessnes and unskilfulness with which the excavation was made, or by the excavation carefully and skilfully made in such a place and to such a depth, that, with reference to Eaton's rights, it was a careless and unskilful thing to make it at all? whether the violation of Eaton's right be called the personal negligence of R, or his unreasonable use of his land?

A use of property, which a jury would find to be a criminal nuisance at common law, may be so authorized by the legislature as to cease to be an indictable offence. To that extent the public protection afforded by the criminal law may be relinquished by the public. *Eastman* v. *A. M. Co.*, 44 N. H. 143, 160; *Eaton* v. *B. C. & M. R. R.*, 51 N. H. 504, 510, 529; *King* v. *Pease*, 4 B. & Ad. 30; *Com.* v. *Tewksbury*, 11 Met. 55. In the criminal law an act thus authorized is lawful, and this limited principle, inconsiderately and indiscriminately extended to civil cases and private rights, may have helped to carry confusion into American constitutional law.

One of the most fruitful sources of constitutional error in this country is the influence of English precedent when not counteracted by a close attention to the difference between the supremacy of parliament and the limited power of an American legislature. *Eaton* v. *R. R.*, pp. 516, 517. The omnipotence of parliament is the only English principle that is constitutional in the American sense of the word. Other principles, constitutional in the qualified English sense, are supported by custom, history, reverence for ancient precedents and national traditions, acts of parliament, expediency, and the moral sense of the influential classes; but, however securely they may practically rest on that basis, they may be legally disregarded by parliament. An act of parliament, however unconstitutional, in the qualified, English sense of being in conflict with a long-established principle and practice of the country, is a valid law. The legality of what is authorized by absolute power is not open to controversy or doubt. The property of A may be taken from him without compensation, and given to B, or destroyed, for the benefit of B or the public or nobody, and no question arises about the exercise of a power of taxation, police, war, eminent domain, or any particular branch of the legislative omnipotence. Life, liberty, and property are held at the mercy of parliament. That is the constitutional theory; and it is the theory of the system, and not the actual safety of private rights under its practical operation, that is to be borne in mind in the consideration of English decisions on this subject. When a man is paid for property of which he is deprived by authority of parliament, he is paid because parliament, representing the popular sentiment, chooses to be just, and not because he is entitled to compensation as a constitutional right of property, in the American sense. In that sense of constitutionality, no one in England has a right to be indemnified for any injury that parliament may see fit to inflict, or to authorize any one to inflict, upon him. And some of the most valuable of American constitutional guaranties have been in danger of being impaired by the absence of such guaranties in the English constitution, and by the sway of English precedent in this country.

The careful and skilful employment of fire, on one's own land, for manufactures, mining, transportation, and domestic purposes, is, ordinarily, a reasonable use of the land; and for damage resulting from the fire spreading to an adjacent estate, without any fault in the person on whose land the fire originated, no action lies here, because such a use of one's own is not an invasion of another's right. *Brown* v. *Collins*, 53 N. H. 442, 447–450. In England, the contrary rule established in the rude society of early times has been modified by statute. In *Vaughan* v. *T. V. R. Co.* (3 H. & N. 743, 5 H. & N. 679) it was held that the defendants were not liable for damage done on the plaintiff's land by fire communicated from a locomotive engine of the defendants, without fault on their part. It was so held, not because a careful use of fire on the defendants' railway was a reasonable use which the former owner of the land could have rightfully made of his own property at common law, but because the defendants' careful and skilful use of fire

in their locomotives was authorized by parliament.  The decision was put upon the ground that an act authorized by parliament was not a violation of the criminal law, nor in any sense unlawful.  If, by authority of parliament, the defendants had carefully and skilfully consumed the plaintiff's house as fuel in their engines, without compensation, the decision would have been the same, and would have proceeded upon the same principle of arbitrary and unlimited legislative power, which is not a principle of American institutions.  The same doctrine, in regard to the use of water, was laid down in *Sutton* v. *Clarke*, 6 Taunt. 29.  Such authorities, followed in this country, would put an end to our entire constitutional system of government.

Suppose, in Eaton's case, R—the former owner of the land where the cut was made—had owned not only that, but also all the rest of the strip on which the railroad was built, from Concord to the northern end of the road, or had, by contract, acquired from the owners the right to build and use a railroad upon it; and suppose he could have built and used it without infringing any public right of way on land or water, or any other public right: he could, without legislative authority, have lawfully built and used a railroad there for his exclusive private purposes, or for carrying the passengers and freight now carried by the railroad corporation : he could have built it over the spot where the cut was made, without violating Eaton's right.  Such a use of his own land would have been reasonable; but if he had made such a cut there as the corporation made, without taking the precautions necessary to prevent the natural, apparent, and expected consequence of the river being poured upon Eaton's farm, he would have been liable, because such a cut, causing such an injury, would have been an unreasonable use of his own land.  His liability, under such circumstances, was understood to be admitted, and would seem to be too clear to be contested.

Then modify the supposed case, by inserting the fact that he could not have built the road, on the route on which it was built, without infringing public rights of way on land and water; and suppose that difficulty obviated by an act of the legislature, authorizing him to encroach upon public rights of way to an extent necessary for the building of a railroad, to be used by him in the business of a common carrier : such a modification of public rights would not affect Eaton's private right of not being injured in his property by R pouring Baker's river upon his farm.  Modify the supposed case further, by inserting the fact that R obtains a charter, making him a corporation by the name of R : Eaton's right of property would not be affected by the circumstance that the river was poured upon his farm by R, acting, not in his natural capacity, but as an artificial being,—invisible, intangible, and existing only in contemplation of law.  How, then, could R acquire the right to pour the river upon Eaton's farm through a cut which it would be an unreasonable use of his own land for him to make ?  By a purchase, voluntary or compulsory.  The public, exercising the public power of compulsory purchase, otherwise called eminent domain,

whereof compensation is an essential element, could authorize him as a public agent, in his natural or in his artificial capacity, to take as many of Eaton's rights of property as were necessary for a public use. In that way R, as an agent of the public, could obtain Eaton's right of not being injured by an unreasonable use of R's land. That right was property before the B. C. & M. Railroad acquired any of R's rights; and it continued to be property afterwards. It was property that the railroad corporation could not acquire from R; and it could not be transferred to them from Eaton by a compulsory purchase without compensation. To this extent, the doctrine of *Eaton* v. *B. C. & M. R. R.* has been reëxamined, and is affirmed. And this conclusion disposes of some of the questions raised in this case.

III. The plaintiff's land might, without compensation, be legally flowed, to some extent, by persons exercising the public right of navigation. Every log that floats down the river over his land causes the water to rise above its natural level. Floating logs in large quantities may in various ways cause an appreciable and substantial damage to his real and personal estate; and the owner of the logs is not liable for damage resulting from an enjoyment of the public right of navigation, as the owners of steamboats on the Mississippi are not liable for causing the banks to be washed away by an enjoyment of such a right. Property near a land or water highway is held subject to the risks incident to the exercise of the public right. *Brown* v. *Collins*, 53 N. H. 442, 449; *Eaton* v. *Railroad*, p. 530. Dust raised by travellers in the reasonable use of an earth road may cause serious damage to persons living, or carrying on some kinds of business, near by. Logs may, without any fault chargeable to any person, be lodged on the plaintiff's land by a subsiding freshet. Cattle, driven along a public road, may stray into an unfenced field without any fault imputable to the driver. The owners of the logs and cattle may, by the common law, reclaim them (doing no unnecessary damage), without being liable for such mishaps.

The plaintiff claims that he has been injured, not by the reasonable use of the highway in its natural and varying condition, but by an artificial equalization (*Cocheco Co.* v. *Strafford*, 51 N. H. 455, 477, 480) of it, accomplished by the defendant's pouring in (at certain seasons) water which they (by their dams above the plaintiff's land) held back for that purpose. If they were mill-owners, they would have a right to a reasonable use of the stream for their mechanical purposes; and for damage done to the plaintiff's land, by their holding the water back at one time and letting it out at another, within the limits of such a reasonable use, they would not be liable. The natural highway might thus be legally diminished and enlarged; but it would be done in the exercise of the private right of reasonably using the water-power, and not in the exercise of the public right of navigation. In the exercise of the latter right, the defendants might, perhaps, under some circumstances, be justified in enlarging the highway over the plaintiff's land, by other means than the weight of their floating logs. If the river were

dammed up by trees blown across it, and the passage were thus obstructed above the plaintiff's land, there might be a difficulty in holding that the public right of passing was destroyed or suspended, or that a person having occasion to exercise that right could not lawfully remove the obstruction, because the water held back by it, being let out, would enlarge the highway over the plaintiff's land, or because the obstruction would be a natural defect producing a natural insufficiency, and the removal of it would be an artificial improvement,—an alteration of the way made by the continuing operation of creative power.

Suppose R (having no charter or legislative authority, but being a riparian owner, or having the consent of riparian owners) builds a dam where he has a right to build it, above the plaintiff's land, for the purpose of sawing logs, and another dam further up stream for the purpose of floating his logs to his mill-pond, without making any use of and without any design of improving the water-highway below his mill: in the reasonable use of his water-power he could lawfully change the natural level of the water on the plaintiff's land, and alternately narrow and widen the highway there by holding the water back and letting it out. Whether the use of his upper dam and upper pond, for the purpose of transportation, would, as a matter of law, be an unreasonable or illegal use, as against the plaintiff ; whether the location of the saw-mill (or market) above the plaintiff's land, or below it, would, as a matter of law, be the test of the reasonableness or lawfulness of such a use ; whether the law of the case would depend upon the river being or not being a natural highway above either of his dams ; and whether the consequences of his creation or reasonable improvement of navigation, on his own land, or on lands of others with their consent, would be an infringement of the plaintiff's rights, we do not now undertake to decide. To what extent the defendants, as riparian proprietors, or as persons lawfully enjoying some of the rights of such proprietors, or in such reasonable uses as they are entitled at common law to make of the water-power and the highway of the Androscoggin, for the purposes of lumber manufacture or lumber transportation, may be able to change the natural depth and breadth of the river on the plaintiff's land without infringing his rights, is a question to be considered upon the evidence. The defendants desire that the distinct question of the reasonableness of their improvement (under legislative authority) of the highway over the plaintiff's land, be submitted to the jury ; and perhaps such a question may, without inconvenience, be submitted with the other questions of reasonable uses and improvements (in the exercise of common-law rights) above the plaintiff's land. If the jury find the improvement of the highway on the plaintiff's land a reasonable one to be made, as an improvement of the highway at that place, but not as a consequence of reasonable uses or reasonable improvements at other places further up stream, the question may arise whether the right to make a reasonable improvement of the highway at that place is a part of the public right of a highway at the same place, which the legislature may authorize the defendants to exercise.

*Case discharged.*